1  MICHELSON LAW GROUP
   Randy Michelson (SBN 114095)
2  220 Montgomery Street, Suite 2100
   San Francisco, CA 94104
3  Telephone: 415.512.8600
   Facsimile: 415.512.8601
4  Email:    randy.michelson@michelsonlawgroup.com

5  Attorneys for Petitioners
   AgeSong Living, LLC, Nader Shabahangi
6  and Eldership III, LLC

7

8                UNITED STATES BANKRUPTCY COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11 In re                              Case No. 17-30175 HLB

12 AGESONG GENESIS, LLC,               Chapter 11

13              Debtor.                Date:  To Be Determined
                                       Time:  To Be Determined
14                                     Place: Courtroom 19
                                              450 Golden Gate Ave., 16th Floor
15                                            San Francisco, CA 94102

16

17

18   **MOTION OF PETITIONERS AGESONG LIVING, LLC, NADER SHABAHANGI**

19        **AND ELDERSHIP III, LLC TO APPOINT A TRUSTEE**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   STATEMENT OF FACTS ........................................................................................ 1

   A.   Nine Petitioners with Claims of Nearly $1.1 Million Filed this Involuntary Case ............ 1

   B.   Dr. Nader Shabahangi and his AgeSong Companies Serving Elders ................................ 1

   B.   History of the Debtor's Real Property ............................................................................... 2

   C.   The Property's Assignment to Debtor ............................................................................... 4

   D.   Debtor's Encumbrance of the Property .............................................................................. 5

   E.   Dilution of the Company ................................................................................................... 6

   F.   Health and Safety Concerns .............................................................................................. 7

II.  ARGUMENT ........................................................................................................... 11

   A.   Legal Standards for Appointment of a Trustee ............................................................... 11

   B.   Cause Exists to Appoint a Trustee Under Section 1104(a)(1) ........................................ 13

     1.   Debtor Violated California Corporation Code § 17704.05 ...................................... 13

     2.   Debtor is Committing Waste .................................................................................... 15

     3.   Debtor's Incompetence and Mismanagement of the Debtor's Affairs ..................... 15

     4.   Debtor's Conflicts of Interest .................................................................................. 16

   C.   A Trustee Should be Appointed in the Interest of Creditors under  Section 1104(a)(2) .. 17

III. CONCLUSION ........................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hirsch v. Penn. Textile Corp. (In re Centennial Textiles, Inc.),*
  227 B.R. 606 (Bankr. S.D.N.Y. 1998) ............................................... 16
*In re Cardinal Indus., Inc.,* 109 B.R. 755 (Bankr. S.D. Ohio 1990)...................................... 13, 17
*In re Intercat, Inc.,* 247 B.R. 911 (Bankr. S.D. Ga. 2000).......................................... 12, 15
*In re Ionosphere Clubs, Inc.,* 113 B.R. 164 (Bankr. S.D.N.Y. 1990)........................ 12, 13, 17
*In re Lowenschuss,* 171 F.3d 673 (9th Cir. 1999) .............................................. 11
*In re Marvel Entm't Group,* 140 F.3d 463 (3d Cir. 1998) .................................... 12, 13
*In re Microwave Prods. of Am., Inc.,* 102 B.R. 666 (Bankr. W.D. Tenn. 1989) ................ 13
*In re V. Savino Oil & Heating Co.,* 99 B.R. 518 (Bankr. E.D.N.Y. 1989) ...................... 12, 16
*Oklahoma Ref. Co. v. Blank (In re Oklahoma Ref. Co.),* 838 F.2d 1133 (10th Cir. 1988).......... 12

**Statutes**

11 U.S.C. § 1104(a) ............................................................. 11, 12, 15
11 U.S.C. § 1104(a)(1) ...................................................... 11, 12, 13, 16
11 U.S.C. § 1104(a)(2) ...................................................... 12, 13, 17
22 CCR § 87213 ................................................................ 16
22 CCR § 87355 ................................................................. 8
22 CCR § 87356 ................................................................. 8
California Corporation Code § 17704.05 .................................... 13, 14
California Corporation Code § 17704.06 ........................................ 14
California Uniform Voidable Transactions Act, Civil Code §§ 3439-3439.12 ........ 14
California Corporation Code § 17704.05(d) ..................................... 14
California Corporation Code § 17704.06(a)&(c) ................................. 14
California Health & Safety Code § 1569.17 ...................................... 7

1     Petitioners Nader Shabahangi ("Shabahangi"), AgeSong Living, LLC, a California

2   limited liability company ("AgeSong"), and Eldership III, LLC, a California limited liability

3   company (collectively, "Petitioners") move for the immediate appointment of a Chapter 11

4   Trustee for AgeSong Genesis, LLC (the "Debtor").  The Debtor owns real property which houses

5   an eldercare community licensed for 76 residents.

6     As Petitioners detail below, the facts demonstrate that cause exists under Section

7   1104(1)(1) to appoint a trustee and doing so would be in the best of creditors under Section

8   1104(a)(2) of the Bankruptcy Code.

9   **I.     STATEMENT OF FACTS**

10    **A.     Nine Petitioners with Claims of Nearly $1.1 Million Filed this Involuntary
              Case**

11

12    On February 24, 2017, nine petitioners, including Petitioners, filed an involuntary

13  Chapter 11 petition (the "Petition") against debtor AgeSong Genesis, LLC, a California limited

    liability company (the "Debtor"). According to the Petition, the nine petitioners hold claims

14  against the Debtor which total $1,099,771.78.  The claims of the movants, Petitioners, exceed

15  $1,078,000.00.

16    The claims of the petitioners are based on various obligations, including for salary, a

17  bonus, unpaid vacation pay due to terminated employees, consulting fees, management fees and

18  an assignment fee.

19

20    **B.     Dr. Nader Shabahangi and his AgeSong Companies Serving Elders**

21    Petitioner Nader Shabahangi ("Shabahangi") has been involved in geriatric care since

22  1994.  (Shabahangi Decl. ["NS Decl."] at ¶ 2 & **Exhibit 1** thereto)  He has founded several

23  vision-based companies under the "AgeSong" brand to develop and manage elder communities

24  throughout the San Francisco Bay Area.  (*Id.*, ¶ 3)  Shabahangi and his companies employ

25  innovative, holistic, and humanistic approaches to caring for the elderly that include enrichment

26  and wellness programs focused on embracing aging, life-long learning, and community

27  integration despite physical and cognitive challenges.  (*Id.*)

28

1    In addition to designing, developing, and managing residential, assisted-living

2    communities for elders in the San Francisco Bay Area, Shabahangi and his companies focus on:

3    (a) establishing unique mental-health programs for those afflicted with emotional difficulties,

4    including dementia and Alzheimer's; (b) running therapeutic internship programs concerned with

5    present-day understanding of the psychology of aging; and (c) providing individual and group

6    counseling with geriatric-dementia clients.  (*Id.*, ¶ 4)

7            The AgeSong elder communities have ranged up to 165 beds.  (*Id.*, ¶ 5)  Certain

8    communities have focused on specific physical and cognitive challenges, for example, dementia

9    care (a 70-bed community), forgetful and frail elders (a 90-bed community), and elders with

10   memory-loss challenges (56- and 47-bed communities).  The three newest communities that

11   AgeSong has undertaken to manage have been financially distressed.  (*Id.*)  Shabahangi and his

12   companies transformed the first of them (licensed for 37 beds) into a financially and

13   programmatically successful community, and have nearly completed the turnaround of the

14   second (90 beds at 95% occupancy with about 20 legacy low-income residents).  (*Id.*)  The third

15   of these financially distressed companies is the Debtor (74 beds).  (*Id.*)

16           **B.      History of the Debtor's Real Property**

17           The Debtor's primary asset is real property with an historic eldercare community located

18   at 350 University Street, San Francisco, California 94134 [APN: Lot 1; Block 5992] (the

19   "Property").  (*Id.*, ¶ 6)

20           The Property was previously operated by University Mound Ladies Home ("UMLH").

21   (*Id.*, ¶ 7)  On information and belief, UMLH was created in the 1880s with an endowment of

22   cash and real property from philanthropist James Lick to provide quality housing and care for

23   elderly women in need.  (*Id.*)  Eventually, it began to serve low-income elderly men as well. (*Id.*)

24           UMLH had carried on its mission for about 130 years until 2008, when its endowment

25   was almost exhausted.  (*Id.*, ¶ 8)  Around that time, UMLH sought to continue operating its

26   historic elder community based on community and political support, including but not limited to

27

28

1    grants from the City of San Francisco.  (*Id.*)  UMLH continued operating, but by about 2013, it

2    was experiencing monthly operational deficits.  (*Id.*)

3          In Spring 2013, Shabahangi agreed to take over the management and turnaround of the

4    UMLH.  (*Id.*, ¶ 9)  In May 2013, he organized petitioner AgeSong.  (*Id.*)  In August 2013,

5    AgeSong executed a management agreement with UMLH.  (*Id.*)  The management agreement

6    provided that if UMLH desired to sell the Property to a third party, AgeSong had the right to

7    purchase the Property on the same terms.  (*Id.*)

8          AgeSong has been licensed by the California Department of Social Services to manage

9    and operate the eldercare community at the Property since 2013.  (*Id.*, ¶ 10)  AgeSong's current

10   license issued in 2014, which is attached as **Exhibit 2** to the NS Decl.  (*Id.*)

11         Shortly after AgeSong started managing the Property for UMLH, it brought

12   approximately 20 new residents into the community, bringing the census from 20 to 40 or more

13   elders.  (*Id.*, ¶ 11)  By December 2013, UMLH's finances had gone from monthly operational

14   deficits to operational break-even.  (*Id.*)

15         Despite AgeSong's sound management, in 2014, UMLH began the process of closing the

16   community, selling the Property to make way for a private school, and scattering the

17   community's elder residents to whatever other communities would take them.  (*Id.*, ¶ 12)

18         Shabahangi considered UMLH's decision to close the community a terrible blow to its

19   elder residents and a risky proposition in light of their low income and other special needs.  (*Id.*,

20   ¶ 13)  He believed that because of transfer trauma, some residents might not survive relocation to

21   unfamiliar facilities in places far from their families and historic roots in San Francisco.  (*Id.*)

22   Many of the community's elders, their families, other San Francisco residents, and San

23   Francisco's political and community leaders, including Mayor Edwin M. Lee and Supervisor

24   David Campos, were very concerned about these potentially devastating consequences.  (*Id.*)

25   Numerous articles and reports regarding the potential closure and sale of UMLH's elder

26   community appeared in the San Francisco news.  (*Id.*)

27

28

1    Sometime after Shabahangi learned that UMLH intended to close the community and sell

2    the Property, Donald Kung ("Kung") contacted Shabahangi to discuss investing together in the

3    Property and its eldercare community. (*Id.*, ¶ 14). Kung is an experienced RE/MAX agent and

4    sometime investor, or potential investor, in elder communities in the Bay Area. (*Id.*)

5        On July 16, 2014, AgeSong and UMLH entered into an Agreement of Purchase and Sale

6    and Joint Escrow Instructions for the Property, which was subsequently amended by an undated

7    Amendment to Agreement of Purchase and Sale and Joint Escrow Instructions (collectively, the

8    "Purchase Agreement"). (*Id.*, ¶ 15)

9        On July 17, 2014, Kung and Shabahangi caused the Debtor to be organized as a member-

10   managed California limited liability company. (*Id.*, ¶ 16)

11       On July 31, 2014, Kung caused Genesis University, LLC ("GU") to be organized as a

12   California limited liability company. (*Id.*, ¶ 17)

13       On August 5, 2014, Kung and GU's other members executed a *Limited Liability*

14   *Operating Agreement for Genesis University, LLC[;] a Managers-Managed Limited Liability*

15   *Company*. Kung and GU member Steven Kao were the original managers of GU. (*Id.*, ¶ 18)

16       Kung still owns his original membership interest in GU and his former domestic partner

17   Yvonne Lau ("Lau") has purchased the remaining membership interest in GU. (*Id.*, ¶ 19) On

18   information and belief, Lau is now the sole manager of GU. (*Id.*) On information and belief,

19   Lau is a RE/MAX agent. (*Id.*)

20   C.    **The Property's Assignment to Debtor**

21       On August 14, 2014, a wholly owned company of Shabahangi, petitioner Eldership III,

22   LLC ("Eldership III"), a California limited liability company, entered into the operating

23   agreement for the Debtor entitled *Limited Liability Company Agreement of AgeSong Genesis,*

24   *LLC, a California Limited Liability Company* (the "Debtor's Operating Agreement") with GU.

25   (*Id.*, ¶ 20) The Debtor's Operating Agreement is attached as **Exhibit 3** to the Shabahangi

26   Declaration. (*Id.*)

27

28

1   The Debtor's Operating Agreement provided in part that GU would own 90% of Debtor's

2   membership interests and Eldership III would own the remaining 10%.  (*Id.*, ¶ 21 & Ex. A to

3   Ex. 3.)  The Debtor's Operating Agreement gave GU the title of "Manager" of Debtor.  (*Id.*, Ex.

4   3, § 1.6.33).

5        Pursuant to the Debtor's Operating Agreement, Eldership III caused AgeSong to assign

6   AgeSong's rights and obligations under the Purchase Agreement to GU as Eldership III's Initial

7   Capital Contribution to the Company.  (*Id.*, Ex. 3 at § 2.2.1(a)).

8        On August 14, 2014, AgeSong and the Debtor entered into an *Assignment and*

9   *Assumption of Purchase Agreement* whereby AgeSong assigned to the Debtor its right, title, and

10   interest in and to the Purchase Agreement to AG.  (*Id.*, ¶ 23)

11        On August 14, 2014, AgeSong entered into a *Management Agreement* whereby the

12   Debtor hired AgeSong to manage the Property for 10 years. (*Id.*, ¶ 24)

13        On August 15, 2014, Debtor acquired the Property from UMLH.  (*Id.*, ¶ 25)

14   **D.     Debtor's Encumbrance of the Property**

15        On November 9, 2016, a *Notice of Default and Election to Sell Under Deed of Trust* (the

16   "NOD") was filed against the Property.  A February 10, 2017 *Notice of Trustee's Sale* (the

17   "NOS") scheduled a sale of the Property for March 9, 2017.  (*Id.*, ¶ 26)

18        The NOD and NOS pertain to a $4 million loan to Debtor secured in second position

19   against the Property.  (*Id.*, ¶ 27)  Debtor secured this loan on October 17, 2014, from CPIF

20   California, LLC ("CPIF"), a California limited liability.  (*Id.*)  At the time of the CPIF loan,

21   Debtor had previously secured another $4 million loan against the Property on September 17,

22   2014, from Redwood Mortgage Investors VIII ("Redwood"), a California limited partnership.

23   (*Id.*)

24        The Redwood and CPIF loans were concealed from Petitioners when they were made.

25   (*Id.*, ¶ 28)  Shabahangi requested, without success, copies of the loan documents from Debtor

26   and some of GU's members.  (*Id.*)  Shabahangi eventually received copies of the promissory

27   notes for the loans.  They are attached as **Exhibits 4 and 5** to the Shabahangi Declaration.  (*Id.*)

28

1    According to the promissory notes, the Redwood and CPIF loans matured on October 1,

2    2015.  (*Id.*, ¶ 29)  Sometime after the loans issued, Shabahangi learned that a reserve was

3    established for the CPIF loan to pay interest during the loan term.  (*Id.*)  Debtor has apparently

4    not made any payments on the CPIF loan except for interest paid from the established reserve,

5    and only made some eight or nine monthly interest payments on the Redwood loan. (*Id.*)

6        Since the loans matured on October 1, 2015, interest has been accruing on the first loan

7    from Redwood at its default rate of 18% per annum and on the second loan from CPIF at its

8    default rate of 25% per annum.  (*Id.*, ¶ 30)  (The pre-default rates was 8% on the Redwood loan

9    and 14% on the CPIF loan.  (*Id.*))

10       Per the NOS, as of February 10, 2017, the estimated unpaid balance on the CPIF loan

11   was $5,032,603.85.  (*Id.*, ¶ 31)

12       Interest accruing on the Redwood and CPIF loans now exceeds *5,000 per day*, or about

13   *$150,000 per month*.  (*Id.*, ¶ 32)

14       In or around January 2017, the Property achieved 100% occupancy under its license for

15   74 elders.  At full occupancy, the Property's net monthly revenue is in the range of $60,000 to

16   $80,000, exclusive of payments on the Redwood and CPIF loans, which is insufficient to pay the

17   interest accruing on them.  (*Id.*, ¶ 33)

18       **E.    Dilution of the Company**

19       In September and October 2014, Debtor apparently made unlawful payments totaling

20   $5.7 million of the proceeds from the Redwood and CPIF loans to certain members of GU,

21   which owns 90% of Debtor's membership interests.  (*Id.*, ¶ 34)

22       According to Debtor's financial projections prepared and included as Exhibit A to the

23   Management Agreement between Debtor and AgeSong, Debtor expected to incur an estimated

24   ***net loss*** of $692,181 in its first year of operations.  (*Id.*, ¶ 35 and **Exhibit 7** thereto)

25   Accordingly, when Debtor distributed $5.7 million of the $8 million in loan proceeds, it had no

26   reasonable expectation that it would be able to repay the loans on their maturity dates of

27   October 11, 2015.

28

1      Apparently, Debtor has never made a single principal payment on the loans since they

2  were taken out in 2014, and interest payments on the CPIF loan ended in 2015.  Since the loans

3  went into default, Debtor has consistently failed to present a path forward that is in the best

4  interests of its creditors and the elders living at the Property.  (*Id.*, ¶ 36)  Debtor has received

5  expressions of interest from third parties to purchase the Property in amounts substantially higher

6  than the outstanding debt, including a $22 million offer to purchase the Property, which Debtor

7  apparently declined to consider without performing appropriate due diligence. (*Id.*)

8      Shabahangi is aware of multiple third parties who are interested purchasing the Property

9  for amounts substantially in excess of the loan balances.  (*Id.*, ¶ 37)  Yet, Debtor does not seem

10  to be taking any steps to cure the loan defaults, refinance the loans, or sell the Property.  (*Id.*)

11  Instead, Debtor has continued to allow its assets to be wasted, including by interest accruals of

12  over $5,000 per day. (*Id.*)

13      **F.      Health and Safety Concerns**

14      Debtor is putting at risk the health and safety of elder residents at the Property.  (*Id.*, ¶ 38)

15      As a preliminary matter, none of the other direct or indirect owners of the Debtor, other

16  than Shabahangi, have any medical training, nursing training, or any other training relevant to

17  eldercare generally, counseling, or to any subspecialized areas of treatment of elders, such as

18  counseling clients with emotional difficulties such as dementia or Alzheimer's dementia.  (*Id.*,

19  ¶ 39)  The two other indirect owners, Kung and Lau, are (or were until recently) professional

20  realtors.  (*Id.*)  In fact, in and around the Summer of 2016, Lau asked Shabahangi if she could

21  become an intern at AgeSong.  (*Id.*)  Further, on information and belief, Kung's and Lau's

22  presence at the Property is in violation of DSS requirements requiring fingerprinting, background

23  checks, and criminal record clearance for personnel of a residential care facility for elders who

24  have unsupervised contact with elders.  (*Id.*)  *See* Health & Saf. Code § 1569.17 (fingerprint and

25  criminal records requirements for Residential Care for Elder facilities); 22 CCR §§ 87355 &

26  87356 (Criminal Record Clearance regulation and Exemption Regulation).

27

28

1    Debtor is also putting the health and safety of elder residents at risk by refusing to

2    upgrade the nurse-intercom system that enables elders to call for emergency assistance.  (*Id.*,

3    ¶ 40)  Debtor also refuses to complete minor and inexpensive enhancements to evacuation

4    signage deemed necessary by the Fire Marshal.  (*Id.*)  The evacuation-signage improvements and

5    their inspection by the Fire Marshal are also the last items necessary for AgeSong to increase the

6    Property's capacity from 74 to 96 elders, which would allow Debtor to take advantage of

7    economies of scale and become more profitable.  (*Id.*)  (By Shabahangi's estimates, Debtor

8    would earn an additional $5,000 per resident per month for these additional 22 elders, which

9    would position it to cover the interest accrual at the current default rates. (*Id.*)).

10    Debtor also has incited insubordination among community staff members, over whom

11    AgeSong has "sole discretion with respect to the employment and firing" under the Management

12    Agreement, leading to multiple employee performance problems and a degradation in the care

13    being provided to community elders.  (*Id.*, ¶ 41)  As an illustrative example, one cook at the

14    community recently refused to comply with Shabahangi's requests and requirements for the

15    provision of nutritional services, on the ground that he was employed by Lau, and not by

16    Shabahangi or his companies.  (*Id.*)

17    Debtor's management of the Debtor is spiraling increasingly out of control.  (*Id.*, ¶ 42)

18    Debtor revoked AgeSong's authority over Debtor's bank accounts in December 2016,

19    leaving the community in uncertainty about whether debts, employees, and vendors would be

20    timely paid, or even paid at all.  (*Id.*, ¶ 43)  As a result, in January 2017, the issuance of

21    paychecks to all 70 community staff was delayed.  Further, AgeSong lacks funds for necessary

22    maintenance and repairs.  (*Id.*)  Consequently, Debtor has not paid a $300 cleaning fee for a

23    room that a prospective new elder resident wishes to reside in for $8,000 per month.  (*Id.*)

24    Similarly, Debtor has not released funds for the repair of multiple leaks at the Property during

25    this rainy winter, the residents were without hot water for a day, and certain vendors have

26    withheld services due to lack of payment of routine bills.  (*Id.*)

27

28

1    Debtor also failed to make payroll on February 23, 2017 to at least four critical

2    employees to go unpaid—Debtor's Executive Director, Human Resources Director, Maintenance

3    Director, and a food server.  (*Id.*, ¶ 44; Decl. of Dennis B. Noss at ¶ 5).

4         Although AgeSong was contracted to provide payroll services under the Management

5    Agreement, according to Intuit / QuickBooks, Debtor's manager Lau recently made herself the

6    exclusive owner of the AgeSong's payroll account for the Property, and has restricted access to

7    herself and one other employee of Debtor.  (NS Decl., ¶ 45)  On February 24, 2017, Debtor sent

8    out a staff-wide communication stating that Debtor had engaged a new payroll provider, ADP.

9    (*Id.*)

10        On information and belief, Debtor has also failed to pay the Property's accountant,

11   causing monthly financial reports not to be created for December 2016 and January 2017, and

12   the inability to close the 2016 books, thereby limiting Debtor's opportunities to raise capital,

13   seek alternative funding, and/or provide current financial information to potential purchasers.

14   (*See id.,* ¶ 46)

15        Debtor has also engaged in other unreasonable interference with AgeSong's management

16   of the community under the Management Agreement:

17        •    In January 2017, Lau and a third party demanded that Shabahangi leave the

18             business office at the Property, threatening that they would call the police if

19             Shabahangi refused to comply;

20        •    On information and belief, Lau has been defaming Shabahangi to elder

21             residents, their families, and staff, and otherwise inciting insubordinate

22             behavior among staff that has resulted in the deterioration of services to

23             community residents;

24        •    The Debtor's business office has been thrown into disarray by Lau's actions

25             on behalf of GU and the Debtor, with unopened mail going back to January

26             2017, missing binders of Vendor Contracts, unaddressed punch errors relating

27             to employee timecards, and thousands of dollars of unpaid outstanding bills

28

1            that were formerly routinely paid by AgeSong on behalf of the Debtor; and

2            •    Debtor apparently contacted DSS recently to change the contact information

3                 for AgeSong's license to operate and manage the Property.

4   (*Id.*, ¶ 47) A true and correct copy of the DSS license page obtained on February 20, 2017,

5   showing updated, incorrect contact information for AgeSong is attached as **Exhibit 6** to the NS

6   Declaration. (*Id.*)

7       The Debtor's improper involvement in AgeSong's management and operation of the

8   eldercare community is causing confusion, intimidation, and anxiety among the elders under care

9   and community staff, and interferes with AgeSong's performance, quality control, and risk

10   compliance under AgeSong's management agreement with Debtor. (*Id.*, ¶ 48)

11       Dr. Dennis B. Noss ("Noss") has served as the Executive Director of the elder

12   community at the Property since February 8, 2017. Noss is a licensed California nursing home

13   administrator and a certified Residential Care for Elders ("RCFE") administrator. He is also a

14   podiatrist licensed in Massachusetts. His observations of the Debtor confirm that Debtor is

15   putting at risk the health and safety of elder residents at the Property, and that conditions at the

16   Property are rapidly deteriorating. (Noss Declaration ["Noss Decl."] at ¶¶ 3&4) Debtor

17   provides no emergency cash for facility needs, including the repair of equipment that is broken

18   or in violation of fire and health and safety codes. (*Id.*, ¶¶ 6 & 7). Maintenance personnel do not

19   have tools and other items on hand for immediate needs. (*Id.*, ¶ 7) Repairs at the Property

20   projected to cost $59,875 to correct environmental health and safety violations need to be

21   performed. (*Id.*, ¶ 8). Housekeeping and Laundry similarly do not have a reserve supply of

22   necessary day-to-day items—bath and face towels, fitted sheets, and comforters—and cannot

23   immediately purchase them. (*Id.*, ¶ 10) Residents on occasion cannot get a face towel for basic

24   hygiene needs, and either larger towels have been cut up to serve, or the residents do not receive

25   a new clean towel. (*Id.*, ¶ 10). All funds must be requisitioned on a case-by-case basis from

26   Lau, with consequent delays in ensuring the health and welfare of residents. (*Id.*, ¶ 6)

27

28

1    Further, Debtor's business office is in disarray.  (*Id.*, ¶ 11)  Complaints by family

2    members concerning billing and routine financial matters are daily occurrences.  (*Id.*)  Debtor

3    has left unlocked and unsecured the personal cash resources of elders used to pay for additional

4    critical services and confidential personnel files.  (*Id.*)

5    Further, the community staff is confused about who their directions should come from:

6    Dr. Noss, the Debtor's Executive Director, or Lau.  (*Id.*, ¶ 12)  Various department heads have

7    called in sick on the same days in what may be a coordinated effort.  This causes low morale

8    among staff and raises the potential for serious problems in the level, consistency and safety of

9    patient care at the community. (*Id.*)

10   **II.    ARGUMENT**

11          **A.    Legal Standards for Appointment of a Trustee**

12          Appointment of a Chapter 11 trustee is governed by Section 1104(a) of the Bankruptcy

13   Code, which requires a trustee to be appointed (1) for "cause" or (2) if such appointment is in the

14   best interest of creditors, equity security holders or other interests of the estate:

15                  (a)    At any time after the commencement of the case but before
16          confirmation of a plan, on request of a party in interest or the United States
             Trustee, and after notice and a hearing, the Court shall order the appointment of a
17          trustee –

18                         (1)    For cause, including fraud, dishonesty, incompetence, or
                    gross mismanagement of the affairs of the debtor by current management,
                    either before or after the commencement of the case, or similar cause, but
19                  not including the number of holders of securities of the debtor or the
                    amount of assets or liabilities of the debtor; or
20
                           (2) If such appointment is in the interests of creditors, any equity
21                  security holders, and other interests of the estate, without regard to the
                    number of holders of securities of the debtor or the amount of assets or
22                  liabilities of the debtor.

23   11 U.S.C. § 1104(a).  Either of the independent grounds is sufficient to justify granting a

24   motion to appoint a trustee.  *In re Lowenschuss*, 171 F.3d 673, 685 (9th Cir. 1999).

25          Under Section 1104(a)(1), the determination of "cause" is within the broad discretion of

26   the court.  *Id.*  If the court finds "cause," then appointment of a trustee is mandatory.  *Oklahoma*

27

28

1  *Ref. Co. v. Blank (In re Oklahoma Ref. Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V.*

2  *Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

3          Depending on the circumstances, factors in determining if there is cause to appoint a

4  trustee may include:

5       (1)     the existence and materiality of any misconduct on the part of the debtor in

6               possession;

7       (2)     the evenhandedness in dealing with insiders or affiliates;

8       (3)     the existence of preferences or fraudulent conveyances;

9       (4)     the unwillingness or inability of management to pursue the estate's causes of

10               action;

11       (5)     conflicts of interest on the part of management of the debtor in possession; and

12       (6)     self-dealing by management or waste of corporate assets.

13  *See, e.g.*, *In re Intercat, Inc.*, 247 B.R. 911, 921 (Bankr. S.D. Ga. 2000).

14          Section 1104(a)(1) does not provide an exhaustive list of causes mandating the

15  appointment of a trustee.  *See, e.g., In re Marvel Entm't Group*, 140 F.3d 463, 472 (3d Cir. 1998)

16  (upholding appointment of a trustee where (1) acrimony between debtor and its creditors rose to

17  level of "cause," and (2) appointment of trustee was found to be in the best interests of the

18  parties and the estate).  Courts recognize that the language "or similar cause" in Section

19  1104(a)(1) encompasses a wide range of conduct, and must be made on a case-by-case basis.

20  *See id.* at 472-73.  In fact, the Court need not find any of the enumerated wrongs in the statute to

21  find cause to appoint a trustee.  In re *In re Oklahoma Ref. Co.*), 838 F.2d at 1136.

22          Even without a finding of "cause," Section 1104(a)(2) allows appointment of a trustee to

23  address "the interests of the creditors, any equity security holders, and other interests of the

24  estate." 11 U.S.C. § 1104(a)(2).  *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr.

25  S.D.N.Y. 1990).  Whereas Section 1104(a)(1) "provides for mandatory appointment upon a

26  specific finding of cause," Section 1104(a)(2) "envisions a flexible standard" that gives the court

27

28

1　discretion to appoint a trustee 'when to do so would serve the parties' and estate's interests.'" *In*

2　*re Marvel Entm't Group*, 140 F.3d at 474.

3　　　　With respect to the appointment of a trustee under Section 1104(a)(2), courts "eschew

4　rigid absolutes and look to the practical realities and necessities." *In re Ionosphere Clubs, Inc.*,

5　113 B.R. at 168. Among the factors considered are:

6　　　　(1)　　the trustworthiness of the debtor;

7　　　　(2)　　the prospects for the debtor's rehabilitation guided by present management;

8　　　　(3)　　the creditors' confidence, or lack thereof, in present management; and

9　　　　(4)　　the benefits derived from appointment of a trustee, balanced against the cost of

10　　　　　　　the appointment.

11　*Id.; In re Microwave Prods. of Am., Inc.*, 102 B.R. 666, 675 (Bankr. W.D. Tenn. 1989); *In re*

12　*Cardinal Indus., Inc.*, 109 B.R. 755, 767 (Bankr. S.D. Ohio 1990).

13　　　　Many courts have appointed a trustee under Section 1104(a)(2) where there is such a loss

14　of confidence in the debtor's management that the failure to appoint a trustee would "jeopardize

15　whatever chance exists to realize the potential value of these estates." *In re Cardinal Indus.,*

16　*Inc.*, 109 B.R. at 767; *accord*, *In re Microwave Prods. Of Am. Inc.*, 102 B.R. at 676 (appointing

17　trustee was in best interest of estate "based in part on the considerable and continuing erosion of

18　confidence in the debtor . . . to operate the company.").

19　　　　**B.　　Cause Exists to Appoint a Trustee Under Section 1104(a)(1)**

20　　　　As the plain language of Section 1104(a)(1) makes clear, the improper prepetition

21　misconduct by Debtor's current management is sufficient by itself to warrant the appointment of

22　a trustee. *See* 11 U.S.C. ¶ 1104(a)(1).

23　　　　　　　**1.　　Debtor Violated California Corporation Code § 17704.05**

24　　　　Here, substantial prepetition misconduct by Debtor's manager GU constitutes cause to

25　appoint a trustee. In violation of Corporations Code § 17704.05, Debtor made unlawful

26　distributions to certain members of GU totaling $5.7 million of the proceeds from the Redwood

27

28

1    and CPIF loans.  Under California law, GU is liable for the return of those unlawful

2    distributions.  *See id.,* § 17704.06.

3          Corporations Code § 17704.05 establishes limitations on distributions that Debtor, a

4    California limited liability company, can lawfully make:

5          A limited liability company shall not make a distribution if after
           the distribution * * * * [t]he limited liability company would not
6          be able to pay its debts as they become due in the ordinary course
           of the limited liability company's activities.
7

8    Corp. Code ¶ 17704.05(a)(1).  Here, Debtor's distributions of $5.7 million of the Redwood and

9    CPIF loan proceeds to certain members of Debtor's manager GU were illegal under Section

10   17704.05.  Debtor had no reasonable expectation that it would be able to repay the principal due

11   on the loans when they matured on October 1, 2015.  (NS Decl. ¶ 35)  Nor did Debtor have any

12   reasonable expectation that it would even be able to service monthly interest on the loans

13   thereafter: according to Debtor's financial projections included as Exhibit A to the Management

14   Agreement between Debtor and AgeSong, Debtor expected to incur an estimated **net loss** of

15   $692,181 in its first year of operations.  (*Id.* and **Exhibit 7** thereto.)  Debtor's revenue thereafter

16   was not expected to be—and was not—sufficient to cover debt service.  (*Id.*)

17         Debtor is liable for these unlawful distributions under Corporations Code § 17704.05(d).

18   Further, GU and GU members who received the distributions can be held personally liable to

19   Debtor for them.  *See* Corp. Code § 17704.06(a)&(c) (establishing personal liability for members

20   and managers who consent to a distribution in violation of Section 17704.05, and for third

21   persons who receive distributions knowing they violate Section 17704.05).

22         Even if GU and its members were somehow not obligated under Corporations Code

23   § 17704.06 to return the improper distributions—which they are—they could nevertheless be

24   liable for them under California's Uniform Voidable Transactions Act, Civil Code §§ 3439-

25   3439.12.  But neither Debtor nor GU has returned or done anything to secure the return of the

26   Debtor's unlawful distributions.  (NS Decl. ¶ 37)  Cause for mandatory appointment of a trustee

27

28

Case: 17-30175    Doc# 9    Filed: 02/28/17    Entered: 02/28/17 11:12:24    Page 17 of
21

1   exists where fraudulent conveyances and preferences have occurred.  *See In re Intercat, Inc.,*

2   *supra*, 247 B.R. at 921.

3                      **2.      Debtor is Committing Waste**

4           Incompetence and mismanagement of the affairs of the Debtor also constitute cause to

5   appoint a trustee under Bankruptcy Code ¶ 1104(a).  Here, Debtor's waste of its assets is a

6   compelling reason for a Trustee to be appointed.  At the default rates of interest—18% on the

7   Redwood loan and 25% on the CPIF loan (NS Decl. ¶ 30)—interest is accruing at over *$5,000*

8   *per day*, or about *$150,000 per month*.  (*Id.*, ¶ 32)  Yet, Debtor does not appear to be taking any

9   steps to cure the loan defaults, refinance the loans, or sell the Property.  (*Id.*, ¶ 37)

10          Debtor's further mismanagement of its business and affairs compounds this problem.  Its

11  failure to pay the Property's accountant has resulted in financial reports not being created for

12  December 2016 and January 2017, and the inability to close the 2016 books, thereby limiting

13  Debtor's opportunities to provide current financial information to banks, potential investors, and

14  parties interested in acquiring the Property.  (*Id.*, ¶ 46).

15                     **3.      Debtor's Incompetence and Mismanagement of the Debtor's Affairs**

16          Debtor's incompetence and mismanagement is also putting at risk the health and safety of

17  elder residents at the Property.  (NS Decl. at ¶ 38)  Debtor's manager Lau is a realtor who lacks

18  medical, nursing, and counseling experience and training, and indeed any eldercare experience

19  and training, as evidence by her request to become an intern with AgeSong last summer.  (*Id.*, ¶

20  39)

21          Debtor has failed to address critical health and safety issues at the Property, such as

22  upgrades to the emergency intercom systems, and refuses to make minor and inexpensive

23  enhancements to evacuation signage deemed necessary by the fire marshal. (*Id.*, ¶ 40)  Were the

24  evacuation signage improved and signed off by the Fire Marshal, AgeSong could increase the

25  Property's capacity from 74 to 96 elders, to the financial benefit of the Debtor.  (*Id.*)

26          Debtor's management of the Property is spiraling out of control.  (*Id.*, ¶ 42)  Debtor is

27  struggling increasingly to perform basic business functions like making payroll, and ensuring

28

Case: 17-30175    Doc# 9    Filed: 02/28/17    Entered: 02/28/17 11:12:24    Page 18 of
21

1  that critical facility needs such as Maintenance, Housekeeping, and Laundry services can be

2  timely provided, and that maintenance to correct environmental and health and safety violations

3  is performed.  DSS regulations for eldercare facilities require there to be a financial plan that

4  "assures sufficient resources to meet operating costs for care of residents." 22 CCR § 87213

5       Further, not only is Debtor's involvement in management interfering with AgeSong's

6  performance, quality control and risk compliance, Debtor seems actively trying to interfere with

7  AgeSong's operation of the eldercare community by inciting insubordination among staff,

8  encouraging a coordinated "sick in" among Department Heads, and interfering with AgeSong's

9  license to operate and manage the Property.  (NS Decl., ¶¶ 47 & 48; Noss Decl. ¶ 12)

10              **4.      Debtor's Conflicts of Interest**

11      Debtor has a hopeless conflict of interest in this case.  Certain of GU's members are

12  personally liable for the illegal distributions of $5.7 million of the Redwood and CPIF loan

13  proceeds. Yet, Debtor has done nothing to seek the return of these illegal distributions.  Nor has

14  Debtor attempted to renegotiate more favorable loan terms, secure additional capital or

15  alternative financing, duly consider bona fide third-party offers to acquire the Property for

16  amounts substantially in excess of sums due on the loans.

17      In short, Debtor's conduct evidences that the Debtor's focus is on something other

18  maximizing the value of the estate for the benefit of the creditors.  Such mismanagement and bad

19  faith makes clear that the Debtor cannot be entrusted to manage the estate's assets and affairs,

20  and constitutes cause for the appointment of a trustee.  *See, e.g., In re V. Savino Oil and Heating*

21  *Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("The willingness of Congress to leave a debtor-

22  in-possession is premised an expectation that current management can be depended upon to carry

23  out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this

24  respect, Section 1104(a)(1) [of the Bankruptcy Code] commands that stewardship of the

25  reorganization effort must be turned over to an independent trustee.")  *Hirsch v. Penn. Textile*

26  *Corp. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("As

27  fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case

28

Case: 17-30175    Doc# 9    Filed: 02/28/17    Entered: 02/28/17 11:12:24    Page 19 of
21

1  fairly, maximize the value of the estate, and protect and preserve the debtor's property."

2  (Citations omitted.).

3  **C.    A Trustee Should be Appointed in the Interest of Creditors under Section 1104(a)(2)**

4

5  Even if there were insufficient "cause" to appoint a trustee—which Petitioners deny—

6  Petitioners respectfully request the Court to appoint a trustee in the best interests of the creditors

7  under Section 1104(a)(2).

8  All the facts and circumstances described above demonstrate that appointment of a

9  trustee is in the best interest of the creditors and the estate – as well as the eldercare community's

10  frail elders.  The creditors' desire for immediate appointment of a trustee should carry great

11  weight in the Court's analysis of Section 1104(a)(2) of the Bankruptcy Code.  The interests of

12  creditors will be served by immediate granting of this Motion.  Among other things, the trustee –

13  a neutral and qualified third party – will: (i) analyze whether it is in the best interests of creditors

14  to sell the Debtor's assets or attempt to reorganize; (ii) if a sale is in the best interests of the

15  creditors, establish a fair sale process free of collusion by the Debtor's principals; (iii) negotiate

16  the terms of a consensual plan of reorganization or liquidation; and (iv) promptly and

17  appropriately deal with developing case matters.

18  The Petitioners have reviewed the costs and uncertainties, if any, that could arise by the

19  appointment of a trustee and the potential benefits of such appointment, and believe the scale tilts

20  overwhelmingly in favor of a trustee. Justifiably, the Petitioners—creditors holding over $1.0

21  million in claims against the Debtor—have no faith in the Debtor and its decision-making and

22  management ability.  Further, Debtor's manager lacks the experience and qualifications to serve

23  as the manager of the eldercare community or the chief restructuring officer of the Debtor.

24  Under these circumstances, and looking at the practical realities and necessities here, *In*

25  *re Ionosphere Clubs, Inc.,* 113 B.R. at 168, it is impossible to imagine a successful resolution of

26  this case without the intervention of a trustee.  *See, e.g., Cardinal, supra*, 109 B.R. at 767

27  (ordering appointment of trustee and giving great weight to creditors' analysis of risks,

28

1 | uncertainties, and dislocations occasioned by appointment of trustee.)  Two months after Debtor
2 | was organized, it stripped $5.7 million out of the entity, setting up the dire financial crisis it faces
3 | today, and it has done nothing to address that situation.  Debtor is hopelessly conflicted by its
4 | violation of Corporations Code § 17704.05.  Shabahangi is the DSS-licensed professional
5 | responsible for the care of the elder community at the Property.  The Debtor is preventing
6 | AgeSong and Shabahangi from properly managing the community under its Management
7 | Agreement, creating risks to over sixty frail elders, some on hospice and some bedridden, and
8 | many of whom suffer from physical and cognitive impairments that require professional,
9 | sensitive and in-depth care.

10 **III.    CONCLUSION**

11 Petitioners respectfully request that the Court enter an order (i) granting the Motion; (ii)

12 directing the appointment of a Chapter 11 trustee; and (iii) granting such further relief as may be

13 just and appropriate.

DATED:  February 28, 2017                    MICHELSON LAW GROUP


By:      _/ s / Randy Michelson_
                                        Randy Michelson
                                        Attorneys for Petitioners
                                        AgeSong Living, LLC, Nader Shabahangi
                                        and Eldership III, LLC